Our first case for the day is Evergreen Square of Cudahy and others against the Wisconsin Housing and Economic Development Authority and Secretary Castro, 16-1475. Mr. Cohen. Good morning. At issue in this case are three housing assistance payments contracts between each of the plaintiffs, which is the owner of a multifamily housing rental project, and the defendant, Appellee, Wisconsin Housing and Economic Development Authority. More specifically, Washington Square Apartments, plaintiff Washington Square Apartments has alleged that WIDA had breached its HAP contract by failing to adjust the contract rents on each anniversary date of the contract. In addition, each of the plaintiff's appellants has alleged that WIDA's reduction of the adjustment factor that it used to adjust the rents by .01 for non-term units also breached each of the plaintiff's HAP contracts. Mr. Cohen, this is Judge Rovner. Hello. Yeah, hi, Judge Rovner. How are you? Fine. Once WIDA began to impose the comparability study requirement on property owners, Washington Square signed two five-year extensions, correct? That is correct. Am I also correct that they knew this was WIDA's practice at the time they signed those extensions? I would assume that's the case, Your Honor. That's not something that was ever discussed or briefed. But the extensions. If so, what I've been wondering is why shouldn't that course of dealing continue to control? Well, Washington Square never acknowledged that WIDA had, that the failure to adjust the contract rents was a breach of its contract. And the extensions were, you know, they didn't change the terms of the contract. None of the terms or provisions of the contract were changed. If WIDA had wanted to, you know, impose this requirement, why didn't it put in the renewal that, you know, it was changing the way the rents should be adjusted? Well, I mean, how are the rent increases for Washington Square handled prior to 2005? I mean, did Washington Square request them? Well, if since 1995, Congress amended Section 8 in 1994, and then HUD implemented those revisions to Section 8 starting in 1995 when it issued Notice 95-12. And since that time, WIDA has administered all its HAT contracts, you know, the HAT contract for Washington Square, the HAT contract for the other two plaintiffs, and the HAT contracts for all the other Section 8 project owners in Wisconsin in accordance with the directives of Notice 95-12 and the subsequent notices that were issued after 95-12 expired. And under those notices, all project owners, not just Washington Square, were required to request a rent increase. Right. So why did it stop requesting them? I do not have an answer to that, Your Honor. I don't know. That's an issue of fact that was never discussed. But I can't imagine that it wasn't discussed because it seems that this was a conditioned precedent and one that was entirely within the plaintiff's control and not particularly onerous, I would imagine. Well, Your Honor, we're not arguing that it's not a conditioned precedent. What we're arguing is, we've conceded that. What we're arguing is that the conditioned precedent should be excused under the Doctrine of Forfeiture. And in addition, it should also be, alternatively, it should be excused because of the fact that WIDA breached the contract. We're not arguing that it's not a conditioned precedent. So we've conceded that it's a conditioned precedent. We did argue in the district court, but we're not arguing that on appeal. Okay. So if the impediment to making the request was the cost of comparability studies, would you argue that Washington Square passed up $400,000 in additional rent because it didn't want to pay $2,500 for a comparability study? I would argue that that's an unknown, Your Honor. What I do know is the fact that they did, that the failure to approve the rent increases did result in a loss of over $400,000 in revenue. And this request requirement is a very de minimis requirement because the other two projects don't have that requirement. And so, obviously, it seems that WIDA had no problem in administering other HAP contracts and approving rent increases without a rent increase. So that's why we believe it's a very de minimis requirement. And when you contrast that with the over $400,000 in revenue that was lost by Washington Square, the balance is much greater in terms of disproportionate forfeiture in favor of Washington Square. During those years, counsel, just a minute. Counsel, during those years, I think it was six years, how much did the agency pay Washington Square in total rent for this project? I don't remember off the top of my head, Your Honor. I mean, I know it's, I believe we have it in one of our stipulated facts. It might have been a couple of million dollars. I'm not, I don't remember exactly how much it was. I'm trying to get a sense of $400,000 compared to what? I don't recall that. I do know that it was in, I believe it's in one of our stipulated, joint stipulation of facts. I believe that figure is in there. I don't think it's precise, but I think it's, counsel, in terms of during these years, it was, you know, in excess of, but I don't remember what it was. In my law practice, I don't believe I ever had a client pay a bill that I had never sent. I don't know whether, how that fits with your experience. No, I believe, I couldn't concur with that. I have not had a client pay a bill without. So it's not onerous to ask for the, that the adjustment be requested, but it does seem that there is, can be a pretty onerous burden if someone in your client's position waits and waits and waits. Public agency sets its budgets, manages its finances for several years, and then you come in years later and say, oh, we forgot to ask you for all these things, and now we'd like to go back and redo years worth of budgeting. Well, in essence, though, what we did is saying if you want your rent increased, you have to pay us to get it. So that'd be like me telling my client that if you want, you know, you have to pay me to pay me. Are you referring there to the rent comparability studies? Yes, Your Honor. Okay, because I thought you were just telling Judge Rovner you did not know why your client stopped requesting rents. I'm not saying, I do not know that, but I do know that WIDA would not have approved a rent increase unless, you know, no rent comparability study, no rent increase. And it's undisputed that each rent comparability study costs $2,500 or $3,000. But Washington Square did submit some, didn't it? No, not during the period in question. Did it ever? I do not know that, Your Honor. For the six years at issue, no, because we had a clout in the district court for reimbursement of the rent comparability studies. And we, after we had filed the lawsuit, we discovered that no rent comparability studies had been submitted within the six-year statute of limitations. So we withdrew that claim. I am very puzzled by your disproportionate forfeiture argument. The doctrine talks about the non-occurrence of a condition. But when the condition is entirely, really entirely within your control, and it is not onerous, why should this doctrine apply at all? I mean, if we read the restatement in the manner that you suggest, a party would never, ever, ever, ever have to fulfill a condition within its own control. If it could show that its own failure subsequently caused it great harm. And that can't possibly be the intention of the restatement, could it? Could it? Your Honor, the fact that the act of requesting a rent increase is not onerous in and of itself. But the fact is, again, we'd have a saying, if you want your rent increase, you have to pay us. And before they changed, before they unilaterally imposed this requirement on Washington Square and the other two plaintiffs and other Section 8 project owners, you didn't have to pay to get your rent increase. You just had to, you know, if you were like Washington Square, you had to request it. And there was no process or procedure for requesting that, you know, that Washington Square, I mean, WIDA prescribed. In fact, there's no evidence as to whether, but presumably you could have called up WIDA and said, hey, I want my rent increase this year. Or you could have sent an email saying, give me my rent increase. But once they changed the rules of the game in the middle of the game, starting in 1995, they said, if you want your rent increase, you need to go out and pay someone. And then after you've spent your money, then we might give you your rent increase. But we don't know whether we'll give you your rent increase. So I think that that is, you know, that's a unilateral revision, modification of the contract, which is a breach, which is another alternative ground for excusing the condition precedent. It is because of the fact that WIDA breached the contract by unilaterally imposing this requirement that you go get a rent incompatibility study before we'll even look at your rent increase request. Well, but so what? You signed the initial 20-year contract. There were five-year renewals. This is part of one of the renewals. And it was 1995 when HUD began requiring landlords to supply those rent comparability studies. And you never, I don't know, I'm at a loss here. All I can say, Your Honor, is that, in our opinion, that WIDA, if they had wanted to revise the contract to include this obligation to request a rent increase and to get, submit a rent comparability study and all the other procedures that were required under the HUD notices, they could have done so, and they did not. The language of the original HAP contract was unaltered. The renewals were not, did not sign. Well, actually, I don't know this for a fact, but I shouldn't say that. But again, WIDA did not include it, and so I would say we need to stay within the four corners of the document. And this unilateral imposition of this requirement, which all courts that have looked at it have found it to be a breach of the contract. That's including district courts, federal district courts, which have dealt with Section 8 contracts between a private project owner and a public housing agency like WIDA, and in addition to contracts where the project, where the contract was between the project owner and HUD. And everyone that has looked at it has decided that imposing this requirement to submit a rent comparability study as a prerequisite, as a precondition, such as the precondition of requesting a rent increase, was a breach of the contract. And therefore, we firmly believe that that breach, which is a material breach of the contract, excused Washington Square from having to comply with the condition precedent. Didn't the Federal Circuit in the Haddon case uphold that requirement? It did. No, no. Oh, yes, it did. It did. It did. And wouldn't we have to split from the First Circuit's decision in that Ken Valley case to find in your favor? Or maybe you would argue that it's distinguishable. Can you argue that it's distinguishable? Your Honor, Ken Valley did not consider whether imposing the rent comparability study requirement as a prerequisite to receive a rent increase was a breach of the contract. All it did was consider whether you could use the HUD's fair market rents as a mechanism for determining whether, you know, for the invoking of the overall limitation clause of the contract. And I would submit that, yes, it can be distinguished because at first it was just wrongly decided. The legal underpinning of Ken Valley is the question. I'm sorry. Did you say it could be distinguished because it was wrongly decided? Is that what you said? I did. Okay. I didn't quite. Yeah. Okay. So I see I'm into my rebuttal time. So I just want to briefly, I really want to also get to the second issue here with respect to reducing the adjustment factors by .01. Just briefly, I believe that, you know, Section 8 itself, which authorizes every Section 8 contract, says that any adjustment has to be based on a reasonable formula. It is our position, as discussed in the brief, that the Table 2 adjustment factors, which are across the board, reduction applicable to all projects in all regions and all geographic areas of the country, are not a reasonable formula. Mr. Cohn, why is this a claim against the state agency, which, as I understand it, just had to apply that factor under HUD regulations? Well. Why isn't your claim really against HUD? Well, we can't. We don't have a claim against HUD because there's no privity to the contract. And again. No, but you're in a regulated party. Why couldn't you have challenged the regulations under the Administrative Procedure Act? I just don't think we would have had standing to do that. And plus, you know, there's nothing in the HAP contract between the owners and WIDA that says that, you know, this is expressly contingent upon you adhering to HUD directives. There's not. Right. No, it does not. Nothing in the HAP contract says that that's the case. And secondly, so you have to read Section 8 into every HAP contract, which requires that it be based on a reasonable formula. And presumably comply with HUD regulations, right? I mean, that's the program. That's normal in federal regulations and federally regulated programs. WIDA has a contract with it between it and HUD. And it's not, you know, it may be a little harsh, but the fact that they're following HUD directives, which breaches our contract, shouldn't penalize the owner. What did WIDA do wrong? They weren't the party setting the reduction. The 1% number came from Congress and from HUD. First of all, it's not 1%, even though everyone saw it as 1%. But be that as it may. Yes, it is. Yes. If you reduce the .01 adjustment factor by .01, that's a 100% reduction. The rent is 1% lower than it overall would have been. But we can quibble about the original. Anyway, the fact of the matter is HUD published adjustment factors which were reasonable. And Section 8 requires that any adjustment be based on a reasonable formula. So if they're using an unreasonable formula, they're violating the contract. Section 8 itself, the overriding statute. And I'd like to conclude with that and maybe keep a minute of rebuttal time. Let me just ask you very quickly. Would half of 1% have been okay? Your Honor, there is no evidence that this reduction, it was done essentially to save money. And there's no correlation with the savings. Even if you can see that the cost associated with non-turnover units is less than the cost of turnover units, there's nothing that indicates that this .01 reduction is correlated to those reduced costs. And it's done solely to save money. Thank you, Counsel. We'll give you a couple minutes for rebuttal. All right. Thank you, Your Honor. We'll next hear from Mr. Jaffe. Mr. Jaffe. Good morning, Your Honors. Can we start with the questions the panel was asking? They were correct. There were always all the landlords asked for extensions after the 95 Act and the entire damage period is at least two extensions into the contracts at paragraph 31 of document 72, the stipulation that WIDA administered the contracts in conformance with the 94 Act is at paragraph 31 and had done so, I think we say since 95. I think the HUD guidance didn't come back until a year later. And that Washington Square always made requests. It never stopped making requests. It only got rent increases when it made requests, paragraph 42 of document 72, and the amount they received over $3 million in paragraph 38 of document 72. And I need to point out that the $400,000 that Mr. Cohen says is disproportionate includes all the damages, both for his count for the automatic increase and his count for the automatic adjustment factor. If you rule in our favor on the automatic adjustment factor, the amount that's even subject to his forfeiture argument becomes much smaller, as discussed at footnote 19 of our brief. As the panel pointed out, not all courts have found the overall limitation is inappropriate, and we would mainly rely on the First Circuit and Maine Housing. Why was Washington Square required to ask for rent increases when it was automatic for others? The plaintiffs say this was a de minimis and technical provision of the contract that really provided no discernible benefit to WIDA. What was the benefit to WIDA? Two things, Your Honor. As Mr. Cohen points out, it changed from the earlier contracts, and these are the same management company running all three projects. They signed contracts for the other two landlords without a request condition, and then were willing to enter into one with this change. The change, we think, indicates its importance in the HUD regulation to move the monitoring of the need for increases. It became more difficult to get increases as rents generally, as Congress found, became above fair market rents. HUD said since most landlords are not going to be entitled to rent increases, we will make the landlord make a request. In 1994, Congress found that over 70% of the Section 8 housing subsidized under this program were over fair market rents. When you're generally not going to give the increase because the landlord is already getting too much money, it seems fair to say, let us know if you think you're one of the small number that are entitled to an increase this year. Where in the record will we find evidence of the burden on RETA from the automatic rent increase system? In other words, what was the time and labor intensive process to which the district court referred? Does the record quantify the burden? I don't think it quantifies the burden in terms of time, Your Honor. It quantifies the burden in terms of risk. We did not undergo to see if a rent increase would be due, other than seeing if applying the HUD rent levels, unless the landlord made a request. It was a burden shifting, a risk shifting, and of course, clear contract law says the court should not rewrite the party's risk. I think that is the burden that RETA no longer had under the Washington Square HAP contract that it did have under the prior HAP contracts. And did RETA require rent comparability studies as a regular practice? Your Honor, it's a two-step process. It's explained much better in the First Circuit's opinion than I probably can do in the few minutes here. RETA made an initial determination based on the HUD published rent levels that you were presumptively over the fair market rents. If you were in that situation, then the landlord had the option of submitting a rent comparability study to show that was not true. Remember, the Supreme Court in Alpine Ridge said no landlord is entitled to a formula-based increase that would exceed rents for comparable unassisted units. And obviously, that's a paraphrase. I have a quote somewhere in my notes. And the First Circuit quoted that. If you appeared to be above those levels, you could show you were not. So the HUD regulations required a rent comparability study after an initial determination was made that it appeared that the landlord was not entitled to the rent increase because his rent was already too high. Now, would Washington Square have been required to produce a study at its own expense if it had requested a rent increase during the relevant time period? Your Honor, Washington Square, if after RETA's initial finding that they were above it, under the HUD regulations, would have been required to submit a rent comparability study. I think it was never resolved in the court below whether that was at its own expense or that was a project expense that would ultimately be reimbursed amount of the cash flow of the project. So I can't answer that question. But as the panel pointed out, to come in with a $2,500 rent increase to get whatever portion, let's just say it's what I think it is, $30,000 a year, to get ten times the benefit for that it seems to me that either Washington Square felt it was not entitled to it, that it wouldn't collect that amount on damages now even if it prevailed, or that it simply, you know, forewent it. And, you know, what legal theory would apply to that I guess we could discuss. But it had a small burden after presumptively finding its rents was too high to get what it thought was a larger amount of money and did not go through those steps. Mr. Jaffe, what are the contracts, particularly with Washington Square, but also the other plaintiffs say about compliance with federal law and perhaps changing regulations in federal law as affecting the program? Yes. I think two things, Your Honor, is the statute, Section 8, and the contract that WIDA enters into with HUD, the assistant contract, which authorizes it. It may not enter into the HAP contract without that HUD assistant contract. Both the law and the contract authorizing our entry into the landlord's contract say the HAP shall be administered in conformity with HUD laws and regulations. And as the panel pointed out, by the time we get to the contracts allegedly breached during this damage period, those were renewed at a time when the law is, as Mr. Cohn complains about it. So we look at the law at the time of contracting, and I think the panel is correct that that's the time of renewal because you could take your housing and go back to the private market if that's where you think you can do better. That's the law you would look at. So for the 2002 and the 2007 renewals, I think the law in place was the 94 Act and the 95 Notice, plus the Table 2 AAFs. But I think as entering into a program where it receives government subsidies, and perhaps this is more your question, Your Honor, it takes the risk that the law would change. People who have a contract with the United States government get some mitigation of that. That's what the Federal Circuit in Haddon, I always forget if it's Haddon 2 or Haddon 3, talks about that the breach there, they found, is Congress as a contracting party switching it. We didn't make the switch. We just followed governing law. We did what it had to do. I mean, as a general matter, in those kinds of situations, there at least theoretically can be room for constitutional challenges if the changes are drastic enough. But I had thought that generally the law, if you enter into a long-term contract in a regulated spending program like this, there's some inherent risk of modification of the program. Yes. I think the general rule is every private contract, and the Supreme Court has said contracts with state agencies are treated not as U.S. government contracts but as private contracts, comes with the inherent risk that the law would change. I see my yellow light has come on. If I can just take a minute, we totally agree. On the adjustment factors, they're imposed on WADA. WADA's contractual obligation is to apply what HUD publishes. Plaintiffs have multiple times stated and stipulated that the Table 2 are the applicable factors, that we think the cases that have reached that conclusion and all cases that have discussed it in terms of a state agency have reached the conclusion that the AAF's Table 2 apply. I have my red light on. If I just say, Mr. Cohen says it's a small amount. It's not really a small amount, Your Honor. It's white. It's 1%. It's 1% of the increase. Thank you, Mr. Jaffe. Mr. DeSellis for the Secretary. Good morning, Your Honors. Let me first focus on the condition precedent, specifically the disproportionate forfeiture argument. One aspect of that that has not been discussed yet this morning is a requirement in the restatement, and this is fundamental to the definition of a forfeiture, that forfeiture occurs only when a party loses its right to the agreed exchange after it has relied substantially, as by preparation or performance, on the expectation of that exchange. Here, however, there's absolutely no evidence that Washington Square took any action in reliance on the rent adjustments that it did not request, nor could it have relied on those rent adjustments when year after year it failed to request them and year after year it didn't receive them. So I just wanted to point that out because there's been some discussion about disproportionality, but, in fact, there wasn't even a forfeiture in the first place because there was no substantial reliance by Washington Square. Washington Square is claiming a loss of approximately $400,000. How much was Washington Square receiving annually from the Section 8 program? I don't have that number in front of me. I calculated it enough to say in our brief that it received millions of dollars. Right. But we could derive that number from information that's in the record, Your Honor. I apologize. I just don't have the number in front of me right now. When parties are talking about disproportionate forfeiture, it's a little odd that nobody seems to have done the math. Right. We don't know how large a part of total revenues the loss would represent. And I realize, you know, look, they're also receiving rent from tenants. But, I mean, what about the amount contributed by the Section 8 program? Is the amount in the record? Yes, Your Honor. I believe it is. Where? Do you know? I believe it can be derived from the parties, specifically from the stipulations. Will that include total rent, that is both the federal share and the tenants' share? That would include monies provided. No, I believe that would include the monies provided by the Public Housing Authority, by RETA. My point, Your Honor, was that even apart from the disproportionality issue, there was a requirement under the law of substantial reliance. So the Court doesn't even need to wade into disproportionality because there's no evidence that Washington Square substantially relied on annual adjustments that it didn't request and didn't receive. There are a couple of arguments. In Washington Square's reply brief, one is that you haven't had a chance to respond to. One was that it would, in fact, be entitled to that entire $400,000 in claims. I'm referring to that argument that it wouldn't be limited to the so-called overall limitation. Can you respond to that? Are you referring, Your Honor, to their argument in the reply brief against the application of the overall limitation in this case and the facts of this case? Yes. The First Circuit set that out in the one in Ken Valley case. The clause in the contract, the overall limitation clause, provides that notwithstanding any other provisions of the contract, adjustments shall not result in a material difference between the rents charged for assisted and comparable unassisted units. As held by the First Circuit, the 1994 amendments, what we call the Fair Market Rent Comparison in the 1994 amendments, provides a reasonable means of applying that clause. So specifically under the Fair Market Rent Comparison, in this case, WIDA would compare the current contract rents with HUD's published Fair Market Rents, and if current contract rents already exceed Fair Market Rents, then there would be no rent increase, absent a demonstration by, in this case, Washington Square, that they were warranted. Go ahead. Just the final point, Your Honor, is that here the facts stipulated by the parties show that for all but a few of the rent increases that Washington Square did not receive, the current contract rents exceeded Fair Market Rents. So in other words, the overall limitation applied as held by the First Circuit and the Wanaken Valley decision, and Washington Square was not entitled to rent increases. Well, can you also respond to that argument in the reply brief that HUD's Fair Market Rents, you know, the defined term, the capital F, capital M, capital R, are not the same as lowercase market rents? That's around maybe page 23, 24, 25? Yes, Your Honor. Of the reply brief. Somewhere in there. Yes, Your Honor. So on page 25, Washington Square claims that HUD has long recognized that Fair Market Rents are not the same as market rent. On the next page, however, they state correctly that as noted by HUD, Fair Market Rents are estimates of market rate rents in specific local areas, and that's something that we stated in our brief, something they quote, and what we cite for that are HUD's regulations, which make clear that Fair Market Rents are estimates of specific local market rents. And they're also based on unit size, in addition to being in a specific area, and they also require that the comparable rent be the same type of housing that would be provided for under Section 8. Just lastly, I'd just like to underscore one last point, and that's that with respect to the repudiation argument, so the argument that Moita repudiated the HAP contract, we set forth several independent bases in our brief for why that's wrong, but ultimately Judge Hamilton is correct that the Federal Circuit rejected that exact argument in the Haddon housing case. That's all I have. If I could just ask you briefly, you had suggested in your brief that Federal Law of Contracts controls here. First, was that ever raised in the District Court? I don't think we expressly raised that. I just don't think the issue was briefed at all one way or the other. Sorry, go ahead. I would have thought that if Federal Contract Law applied here, the jurisdictional issue that brought this case up a couple of years ago would have been much simpler. I understand your point, Your Honor. I think that's correct. We cited the Pierce v. Price case by this court, a Seventh Circuit case, which indicates that Federal Common Law applies to HAP contracts. But I do take your point. Thank you. Thank you. All right, Mr. Cohn, two minutes of rebuttal. Thank you. Just a couple of things. Someone asked about the record. Does the record show the time and labor-intensive process? And I would just say that the time and labor-intensive process referred to by the District Court was the process under the HUD notice. Of course, HUD notice was adopted 12 years after the contract was signed, so there was no labor-intensive process in effect when the contract was executed, even though the condition precedent was in effect. Alpine Ridge, you know, the legal underpinning of Ken Valley is legally deficient because Alpine Ridge decided the question, the issue of whether the Fifth Amendment, whether requiring a comparability study violated the Fifth Amendment. It did not decide the issue of when it is, when you may validly invoke the overall limitation provision. We talk about someone, I believe Mr. Jaffe said, talked about that private persons take the risk that government contracts will change. Well, that's not true, even though that's what WinStar was all about, mobile oil. Congress can change the law, but they can also change, those changes of law can be breaches of the contract, and to the extent they are, even though a governmental agency may have to follow the law, that means that the, that doesn't mean that the contracting party is not, cannot recover for the breach of the contract. Thank you, counsel. The case is taken under advisement.